**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **MICHAEL FLORES, JR.** | § | |
| | § | |
| **v.** | § | **C.A. NO. C-09-080** |
| | § | |
| **NUECES COUNTY, ET AL.** | § | |

**MEMORANDUM OPINION AND ORDER GRANTING**
**NUECES COUNTY'S MOTIONS FOR SUMMARY JUDGMENT**

In this civil rights action, plaintiff Michael Flores, Jr., raises Eighth Amendment claims of failure to protect and unconstitutional conditions of confinement against Nueces County, Texas, as well as a negligence claim. Pending are Nueces County's motion and amended motion for summary judgment. (D.E. 59, 69). For the reasons stated herein, defendant's motion is granted, and plaintiff's claims against Nueces County are dismissed with prejudice.

**I.      Jurisdiction.**

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331. Upon consent of the parties (D.E. 16, 31), this case was referred to the undersigned United States magistrate judge to conduct all further proceedings, including entry of final judgment. See 28 U.S.C. § 636(c).

**II.      Procedural background and plaintiff allegations.**

Plaintiff is a former state prisoner who is now living in Corpus Christi, Texas. His lawsuit concerns events that occurred while he was housed at the Nueces County Jail from January 27, 2009 through June 20, 2009.

Plaintiff filed this lawsuit on April 17, 2009 naming Nueces County as a defendant. (D.E. 1).  On April 20, 2009, plaintiff filed his first amended complaint and added Christus Spohn Hospital as a defendant.  (D.E. 5 at 3).  Following a June 4, 2009 Spears[1]  hearing, plaintiff's claims against Nueces County alleging failure to protect, unconstitutional conditions of confinement, and negligence were retained.  (D.E. 19).

On June 16, 2009, Nueces County was served (D.E.22), and on July 29, 2009, Nueces County filed its answer.  (D.E. 29).

On March 30, 2010, Nueces County filed the instant amended motion for summary judgment.  (D.E. 69).  Nueces County moves for summary judgment, in part, on the grounds that plaintiff failed to respond to its discovery, including Requests for Admissions and interrogatories, such that certain facts have been deemed admitted.  Id.

On April 14, 2010, plaintiff filed a response stating that he answered Nueces County's discovery, but he believed "they never received it."  (D.E. 71).

On June 2, 2010, a hearing was held to determine if plaintiff wanted to resubmit his discovery answers or in any other way respond to the County's summary judgment motion. Plaintiff failed to appear at the hearing.  To date, plaintiff has not filed a response to Nueces County's summary judgment motion.

## III.  Summary judgment evidence.

The summary judgment evidence establishes the following:

---

[1] Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).

2

On January 27, 2009, plaintiff was arrested and taken to Nueces County Jail.  (DSJ[2] Ex. C at 4; Ex. H at 10).  Based on his initial custody assessment, it was determined that he be assigned to the maximum custody level.  (DSJ Ex. M at 1-2).  The reasons given for assigning plaintiff to maximum custody included escape threat, psychological impairment, mental deficiency, and medical.  Id. at 2.  His profile revealed that he had a history of back and knee problems.  Id. at 20-21.  Plaintiff reported that he had been treated by MHMR for depression and bipolar disorder, and at intake, it was noted that he appeared "to have a significant mental problem."  Id. at 22.  Plaintiff was not working or going to school at the time of his arrest because he was disabled.  Id. at 19.  In addition, plaintiff qualified for protective custody due to a past history with Security Threat Groups (S.T.G.) such as Texas Sydicate and Raza Unida.  Id. at 23, 26.

Plaintiff was evaluated by jail health care providers on January 27, 2009.  (DSJ Ex. O at 68).  Plaintiff had severely elevated blood pressure (BP), and hourly BP checks were scheduled.  Id.  He was given the medications Clonodine  and Zestril.  Id.  After his initial BP check, plaintiff refused the hourly checks stating that he did not want to get up for them. Id.    On January 28, 2009, plaintiff was seen in the Jail infirmary by Dr. Flores for his routine blood pressure check.  (DSJ Ex. O at 68).  On a scale of 1 to 10, plaintiff indicated that his pain level was a zero, indicating no pain.  Id.

---

[2] "DSJ" refers to defendants' amended motion for summary judgment, D.E. 69, followed by an exhibit letter and page number, if appropriate.

On January 29, 2009, plaintiff rode the elevator in the Nueces County Courthouse. The elevator stopped approximately 12" higher than the floor.  Plaintiff was in leg irons and his hands were cuffed in front of him.  It was dark, and plaintiff stepped out of the elevator, not realizing that the floor was not aligned.  His arm got caught in the space between the elevator and the wall, twisting and injuring his right shoulder, arm and hand.  (DSJ Ex. O at 128).

On January 30, 2009, plaintiff reported to the infirmary for his blood pressure check and medications.  (DSJ Ex. O at 67).  Plaintiff was given Zestril and Norvasc, and instructed to return the following day.  Id.  His pain intensity level was not noted.  Id.

On February 3, 2009, plaintiff reported to the infirmary complaining of shoulder and hand pain, and scoring his pain level intensity as an "8."  (DSJ Ex. O at 65).  Dr. Flores noted that plaintiff had been injured exiting an elevator when he stumbled to the floor while in handcuffs.  Id.  Dr. Flores' plan was to order x-rays of plaintiff's shoulder, and he prescribed Motrin for plaintiff's pain.  Id.

On March 2, 2009, it was noted in plaintiff's medical records that his prescribed medications had been written in the wrong file.  (DSJ Ex. O at 62).  The error was noted and plaintiff's current medications of an antibiotic and Tylenol 500 mg., were noted in the proper file.  Id.

On March 22, 2009, plaintiff refused medical attention.  (DSJ Ex. O at 60).

On March 26, 2009 at approximately 2:00 in the morning, plaintiff told Officer Hampton that he had found a note under his cell door saying he needed to "catch out of unit."

4

(DSJ Ex. B at 37-38, 41).  Officer Hampton notified Lieutenant Torres, and plaintiff was "racked up" in a different area of the jail pending reclassification.  Id. at 37.  Approximately eight hours later, plaintiff called Officer Callis on a cell phone and asked him not to open his cell door because other inmates had been threatening him whenever the food trays were delivered.  Id. at 39.  Officer Callis noted that plaintiff had already been moved due to his receipt of the threatening note.  Id.  Several inmates told Officer Callis that plaintiff owed them money for commissary but was refusing to pay.  Id.  The inmates were identified as Arrindale, Garcia, and DeLeon.  Id.  Sergeant Guzman ordered that plaintiff be placed on "officer contact only" until his classification was reviewed.    Id.

On April 6, 2009, a state court judge noted that, while being transported by Nueces County security officers, plaintiff fell exiting an elevator and injured his right shoulder.  (DSJ Ex. O at 131).  The judge stated that plaintiff "requires medical attention."  Id.

On April 8, 2009, plaintiff was seen by Dr. Flores for complaints of right shoulder pain since the elevator incident.  (DSJ Ex. O at 56).  Plaintiff scored his pain level as a "9." Id.  Upon examination, Dr. Flores noted muscle atrophy.  Id.  Dr. Flores ordered an x-ray, and prescribed Motrin for pain.  Id.  Thereafter, plaintiff underwent an x-ray of his right shoulder.  (DSJ Ex. O at 155).  The radiologist found "no evidence of acute fracture or dislocation," and "no radiopaque retained foreign objects" were observed.  Id.

On April 14, 2009, plaintiff was seen in medical for a follow-up appointment concerning neuropathy of his right shoulder and arm.  (DSJ Ex. O at 52).  Plaintiff described

his shoulder pain as sharp, constant, and at a level "5." Id.  Plaintiff was prescribed Relafen, and Neurotin, and told to follow-up in 10 days. Id.

On April 17, 2009, plaintiff filed his § 1983 complaint with this Court.  Plaintiff alleged that he had been denied proper medical care following the elevator incident.  (D.E. 1).  Plaintiff also complained that jail personnel had allowed another inmate to enter his cell and to threaten him, in deliberate indifference to his health and safety. Id. Finally, he alleged that he was subjected to unconstitutional conditions of confinement because the jail was on lockdown and he was let out of his cell for a shower or recreation every "30 to 70 hour."

On April 24, 2009, plaintiff reported to the infirmary for his follow-up appointment concerning his shoulder.  (DSJ Ex. O at 49).  Plaintiff reported that he still had constant, sharp shoulder pain, and the pain level was currently a "7." Id.  Plaintiff was continued on Motrin, and he was scheduled for an MRI. Id.

On April 26, 2009, plaintiff submitted an inmate communication form (ICF) complaining of his shoulder pain and relating that he was dropping objects due to the pain. (DSJ Ex. O at 116).  Plaintiff was scheduled for a doctor visit. Id.

On May 2, 2009, plaintiff submitted an ICF complaining that he had lost the use of his right arm and shoulder.  (DSJ Ex. O at 113).  Plaintiff was advised that he was scheduled for an MRI. Id. On May 4, 2009, plaintiff sent an ICF stating that he was still waiting to see a doctor.  (DSJ Ex. O at 110).  He was again advised of the scheduled MRI. Id.

On May 4, 2009, plaintiff's Motrin 600 mg. was refilled. (DSJ Ex. O at 47).

6

On May 7, 2009, plaintiff submitted two ICFs complaining that he did not receive his Motrin for pain.  (DSJ Ex. O at 104, 105).  On May 11, 2009, plaintiff acknowledged that his medications had been corrected.  (DSJ Ex. O at 95).

On May 12, 2009, plaintiff underwent a MRI of his right shoulder.  (DSJ Ex. O at 154, 3).  The radiologist noted a "chronic large full-thickness tear of the supraspinatus tendon with retraction" and atrophic appearance of the supraspinatus muscle.  Id. at 3.  In addition, there was associated tendinopathy/tendinosis, infraspinatus tendon with adjacent peritiendinitis, and fluid in the sub-acromion and subdeltoid bursa.  Id.  In response to an ICF concerning the results of his MRI, plaintiff was advised that he was being referred to the orthopedic clinic.  Id. at 93.

On May 12, 2009, Jail personnel submitted a request for plaintiff to be seen by doctors at the Orthopedic Clinic.  (DSJ Ex. O at 40).

On May 16, 2009, plaintiff submitted an ICF asking about his MRI results.  (DSJ Ex. O at 91).  He was told that he was scheduled to see a doctor.  Id.

On May 18, 2009, plaintiff was seen in the infirmary for continued care and monitoring of his blood pressure.  (DSJ Ex. O at 39).  He was continued on Norvasc, and weekly BP checks ordered.  Id.

On May 19, 2009, plaintiff was seen in the infirmary for his MRI results.  (DSJ Ex. O at 38).  He was advised that he would see an orthopedist.  Id.  In addition, his Motrin was discontinued, and he was started on Tylenol 500 mg.  Id.

On May 21, 2009, plaintiff was seen in medical for complaints of left molar pain. (DSJ Ex. O at 34).  He was started on antibiotics in preparation of a scheduled extraction of the tooth.  Id.

On May 23, 2009, plaintiff submitted an ICF stating that, although he had seen a doctor that day, his arm and shoulder were causing him significant pain, he could not sleep due to the pain, and his pain medications were not working.  (DSJ Ex. O at 88).  Plaintiff was advised that he was scheduled to see a specialist in mid-June.  Id.

On May 26, 2009, plaintiff submitted two ICFs stating that he could not sleep at night because of his right shoulder/arm/hand pain.  (DSJ Ex. O at 83-84).  His Tylenol medication was continued.  Id. at 33.

On May 31, 2009, plaintiff submitted an ICF complaining about shoulder pain.  (DSJ Ex. O at 82).  He was scheduled to see a nurse.  Id.

On June 8, 2009, plaintiff's blood pressure protocol was reviewed.  (DSJ Ex. O at 32).  He was continued on weekly BP checks.  Id.

On June 10, 2009, plaintiff complained of continued muscle pain.  (DSJ Ex. O at 31).  The Tylenol was discontinued, and plaintiff was prescribed Ibuprofen and Naprosyn.  Id.

On June 13, 2009, plaintiff reported to the infirmary complaining of a headache, toothache, and elevated blood pressure.  (DSJ Ex. O at 29).  His pain level was a "6."  Id. at 28.  He then began experiencing chest pain, and EMS was called.  Id. at 26-27.  Plaintiff was admitted to Spohn Hospital–Memorial with symptoms of cardiac arrest.  Id. at 141-46.

A cardiac event was ruled out, and he was discharged three days later.  (DSJ Ex. O at 145-46).

On June 18, 2009, plaintiff was seen in the Orthopedic Clinic at Christus Spohn Hospital - Memorial.   (DSJ Ex. O at 5).  Upon examination, the doctor noted that plaintiff had decreased range of motion as well as weakness in his right shoulder.  Id.  He noted that the MRI revealed that the tear had already filled with fat and fluids, and that plaintiff's shoulder rode high in the humeral head consistent with RC arthopathy.  Id.  The doctor's impression was chronic RC arthopathy and acute exacerbation.  Id.   He opined that plaintiff's injury was not acute or attributable to the elevator incident, and he specifically noted that surgery was not recommended.  Id.

After his discharge from the orthopedic clinic, plaintiff was seen in the Jail infirmary for follow-up care following his hospital admission.  (DSJ Ex. O at 21).  His pain level was a "0."  Id.  His medications were: Neurontin; Norvasc; Zestril; Nitrostat sublingual (as needed); Augmentin; and Ultram.  Id.  It was noted that he had a dentist appointment scheduled for June 22, 2009.  Id.

On June 22, 2009, plaintiff was released from jail as the District Attorney dismissed the charges against him.  (DSJ Ex. B at 55).

## IV.    Summary judgment standard.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  Id.  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." Anderson, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

## V.    Discussion.

### A.    Failure To Exhaust Administrative Remedies.

Nueces County moves for summary judgment on the grounds that plaintiff failed to exhaust his administrative remedies before filing this federal lawsuit.  (See D.E. 69 at 5-7).

The Prison Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

Unexhausted claims cannot be filed in federal court.  See Jones v. Bock, 127 S. Ct. 910, 918-19 (2007).  The exhaustion requirement applies to all inmate suits about jail or prison life, whether involving general circumstances or specific incidents.  Porter v. Nussle, 534 U.S. 516, 532 (2002); Clifford v. Gibbs, 298 F.3d 328, 330 (5th Cir. 2002).  In addition, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process.  Booth v. Churner, 532 U.S. 731, 734 (2001); Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001).  The Supreme Court has clarified that a prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  Woodford v. Ngo, 126 S. Ct. 2378, 2382 (2006).  An inmate's failure to exhaust is an affirmative defense. See Bock, 127 S. Ct. at 921.

Individuals housed at the jail are provided "Inmate Communication Forms"("ICF") that are used to file a complaint or request a service.  (DSJ Ex. B, NCJ Inmate Rules and Regulations at 5-6).  The ICFs are not formal grievance forms, but are used as an informal means to resolve some complaints and concerns.  Id. at 15.

The jail also has a formal grievance procedure that inmates and detainees are required to utilize if they allege they have been subjected to the following: civil rights violations; criminal acts; abridgment of a privilege without just cause; or a prohibited act by a jailer on duty.  (DSJ Ex. B, NCJ Polices and Procedures, Sec. VI at ¶ 6.0; NCJ Inmate Rules & Regulations at 14-15).  The formal procedure supplements, but does not replace, the available informal grievance procedures. (DSJ Ex. B, NCJ Inmate Rules & Regulations at 15).

To start the formal grievance process, an individual must request an inmate grievance form from the inmate grievance officer.  (DSJ Ex. B, NCJ Policies and Procedures, Sec. VI, ¶ 6.0).  Emergency grievances are addressed upon receipt.  Id.  All other grievances are addressed within 15 days of receipt.  Id.  An inmate/detainee will receive an answer to the grievance within 60 days.  Id.  Every grievance is investigated by the grievance officer, and a complete report is made to both the inmate/detainee and to the Sheriff.  Id.  The original grievance is made part of the inmate/detainee's permanent file as maintained by the jail.  Id.  The inmate grievance procedure is posted in each unit of the jail.  Id.  An inmate unhappy with the grievance decision can appeal by submitting an ICF to Administration.  Id.  The grievance appeal board consists of a jail administrator, counselor, and an impartial civilian employee.  Id.  If an inmate/detainee still believes he has been treated unfairly, he may appeal to the Sheriff.  Id.

In this case, plaintiff did not file a grievance in accordance with Nueces County's formal inmate grievance procedure as to his failure to protect and conditions of confinement claims that he raises in this lawsuit.  (See DSJ Ex. C at 76-120, copies of non-medical ICFs and grievances filed by plaintiff while in custody at the Nueces County Jail).  Plaintiff's grievance records demonstrate that, although he filed a large number of grievances in 2009, these grievances did not allege that jail personnel knew of a serious risk of harm to plaintiff's health or safety and failed to take measures to reduce the risk, nor did he complain about the conditions of his confinement.  Id.

13

Reviewing plaintiff's non-medical grievances, it is apparent that he did not file any ICFs or grievances in January or February, 2009. Id. 76-120.  In March 2009, plaintiff filed several ICFs/grievances.  On March 21, 2009, plaintiff inquired about how to get copies of documents. Id. at 114.  On March 23, 2009, plaintiff states that he is "having other problems with staff and jail conditions," and he requests envelopes to submit "sealed grievances" and "official forms." Id. at 112.  The grievance officer responded that plaintiff must first attempt an informal resolution, and also, that he must detail the problem, not just ask for forms. Id.  Plaintiff did not file a follow-up ICF or a formal grievance complaining about any jail condition. On March 24, 2009, plaintiff complained that he was required to keep a copy of all grievances submitted, but that he did not have access to a copy machine. Id. at 113.  He also complained that a copy of the grievance procedure was not posted in the gym or in 2P. Id.  The grievance officer responded that carbon paper had been requested, but until then, staff would provide multiple single copies; and that the grievance procedure would be posted in those areas.  Id.

On March 26, 2009, plaintiff reported that a threatening note advising him to "catch out" had been slipped under his cell door.  (DSJ Ex. B at 37-38, 41).  In response, plaintiff was racked up in a different area and it was ordered that he have "officer contact only" until he could be reclassified.  Id. at 37.  Thereafter, plaintiff did not file any ICFs or grievances claiming that he believed his life was in danger, or that he was receiving threats, or that he did not feel safe.

14

In April 2009, plaintiff filed four ICFs/grievances.  Id. at 42,102, 104, 117.  In an ICF dated April 15, 2009, plaintiff  references the January 2009 elevator incident and complains that he was incorrectly charged a fee to see the doctor.  Id. at 102.  In addition, he requests to see a specialist for his shoulder.  Id.  On April 24, 2009, plaintiff complains that he has not gotten a response to two earlier communications.  Id. at 117.  In an April 26, 2009 ICF, plaintiff  requests that he be able to make copies of certain documents because he does not want jail staff to view the originals.  Id. at 104.  On April 29, 2009, plaintiff complained that an officer had mistakenly given him the medications of another inmate also named Michael Flores.  Id. at 42.  He was instructed to write the grievance officer.  Id.

In May 2009, plaintiff filed several grievances, as follows:

| Date | Page | Nature of complaint |
|------|------|---------------------|
| 5/2 | 97 | Why was complaint sent to medical |
| 5/4 | 105 | Guard reading legal material |
| 5/6 | 98 | Where to send medical complaint |
| 5/6 | 107 | Guards looking at legal work; responses to grievances |
| 5/6 | 115 | Mail delivered after post-date |
| 5/7 | 116 | Complaining grievance procedure is "paper war" |
| 5/8 | 100 | Why was complaint sent to medical |
| 5/9 | 99 | Medication not dispensed properly |
| 5/9 | 108 | Why wasn't reply in sealed envelope |
| 5/9 | 109 | Why was grievance returned |
| 5/12 | 95 | Refused ICFs from staff |
| 5/12 | 96 | Denied ICFs from staff |

15

| 5/13 | 79 | Request to go to law library |
|------|----|------------------------------|
| 5/14 | 44 | Officer reading legal work |
| 5/14 | 92 | Request to go to law library |
| 5/14 | 94 | Unable to call attorney |
| 5/14 | 101 | Where to send specific complaints |
| 5/14 | 110 | Officer reading legal material |
| 5/15 | 43 | Officers woke from deep sleep to shake cell |
| 5/15 | 46 | Officers Chuy and Coffey threatened to toss cell again |
| 5/15 | 47 | Officers Chuy and Coffey harassing another inmate |
| 5/15 | 48 | Officer Chuy and Coffeyy harassing plaintiff and others |
| 5/15 | 49 | Officer refusing to give ICFs |
| 5/15 | 84 | Officers Chuy and Coffey harassing plaintiff and others |
| 5/16 | 82 | Wants more than one writing pen |
| 5/16 | 83 | During shakedown, officers threw away 4 pens |
| 5/16 | 45 | Needs maintenance to come to cell and Officer Chuy threw the request in trash |
| 5/18 | 90 | Officers throwing away ICFs/grievances |
| 5/18 | 91 | Receipt of late-reply |
| 5/18 | 93 | Grievance replies should be in sealed envelope |
| 5/21 | 78 | Send copy of Spears decision |
| 5/27 | 80 | Needs copy paper and pens |

Thus, none of the May 2009 grievances complains that an inmate came into his cell and threatened him, nor does he complain that he is being held in his cell for more than 24-hours at a time.

On June 13, 2009, plaintiff called to jail personnel that his blood pressure was too high and that he did not feel well.  (DSJ Ex. C at 50-53).  An officer escorted plaintiff to medical, and he was later returned to his cell.  Id.  On June 17, 2009, plaintiff filed an ICF

directed to Sergeant Gomez regarding the documentation of his medical complaints. Id. at 54. On June 22, 2009, plaintiff was released.

According to plaintiff's deemed admissions, he was aware of the prison grievance system. (DSJ Ex. P, deemed admission 3). Plaintiff filed informal grievances while at the jail, but he only pursued a select few via the formal grievance process, and those claims did not concern failure to protect or unconstitutional conditions of confinement. (DSJ Ex. B). Despite the fact that the grievance procedures are posted in numerous locations around the jail, plaintiff failed to exhaust properly his administrative remedies as he did not pursue the formal resolution process required for alleged civil rights violations.

The Fifth Circuit has recognized that the exhaustion requirement may, in rare circumstances, be excused where dismissal would be inefficient or would not further the purposes of the PLRA. Wilson, 151 F.3d at 295. For example, exhaustion may be excused where irregularities in the prison administrative system itself prohibited the plaintiff from doing so. Id.; see also Shah v. Quinlin, 901 F.2d 1241, 1244 (5th Cir.1990). An administrative remedy is not available where prison officials ignore or interfere with the prisoner's pursuit of relief. Id. And see Holloway v. Gunnell, 685 F.2d 150, 154 (5th Cir. 1982).

In this case, in failing to file a summary judgment response, plaintiff fails to offer any explanation for failing to pursue his administrative remedies before filing suit. The purpose of the exhaustion requirement is to alert prison officials of problems so that the prison has a chance to address the claims before they reach federal court. Woodford, 126 S. Ct. at 2388.

17

Indeed, Congress intended the administrative process to "filter out some frivolous claims and foster better-prepared litigation once a dispute did move to the courtroom, even absent formal factfinding." Booth, 532 U.S. at 737. In not pursuing his administrative remedies, plaintiff failed to give Nueces County appropriate notice of his claims or the opportunity to rectify those claims before filing suit. Viewing the evidence in the light most favorable to plaintiff, the summary judgment evidence shows that there is no genuine issue of a material fact that plaintiff was aware of the existence of the jail's grievance procedures, but that he did not exhaust them with respect to his failure to protect and unconstitutional conditions of confinement claims against Nueces County. Thus, Nueces County's motion for summary judgment to dismiss plaintiff's claims for failure to exhaust administrative remedies is granted.[3]

### B.    Municipal liability and section 1983.

Plaintiff has sued Nueces County alleging unconstitutional conditions of confinement, failure to protect, and negligence.

Liability of a municipality under § 1983 requires proof of three elements:  a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom. Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978); Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir. 2009). These three elements are necessary to distinguish individual violations perpetrated by local government employees

---

[3]Nueces County also argued that plaintiff's injuries in this case were *de minimis*. Because of the ruling on exhaustion, this argument is not addressed.

from those that can be fairly identified as actions of the government itself. <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 578 (5th Cir. 2001).

An "official policy" may be either a written policy or "a persistent widespread practice of [municipal] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." <u>Lawson v. Dallas County</u>, 286 F.3d 257, 263 (5th Cir. 2002) (quoting <u>Webster v. City of Houston</u>, 735 F.Cir.1984) (en banc)).   There must be a link between the policy and the constitutional violation, and the policy must be maintained with an objective deliberate indifference to a constitutionally protected right. <u>Id.</u> at 264.  An isolated incident is not sufficient to show a custom.  <u>Bennett v. City of Slidell</u>, 728 F.2d 762, 768 n. 3 (5th Cir. 1984) (en banc), <u>cert. denied</u>, 472 U.S. 1016 (1985).

### 1.  Failure to protect.

Plaintiff claims that Nueces County failed to protect him, noting that in March 2009, he found a threatening note in his cell, and that other offenders were threatening and harassing him.

 Prison officials have a duty to protect prisoners from violence at the hand of other prisoners. <u>Cantu v. Jones</u>, 293 F.3d 839, 844 (5th Cir. 2002) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994)).  A prison official is deliberately indifferent to the inmate's safety if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. <u>Cantu</u>, 293 F.3d at 844 (citing <u>Farmer</u>, 511 at 847).  Deliberate indifference describes a state of mind "more blameworthy than

negligence"; there must be "more than ordinary lack of due care for the prisoner's interests or safety." Farmer, 511 U.S. at 835.

In this case, to hold Nueces County liable for the alleged failure of its jail officials to protect him from other offenders, plaintiff would have to establish that Nueces County either had an official policy to not protect prisoners, or present evidence that inmate on inmate violence was so prevalent that it could be inferred that Nueces County had a custom of allowing prisoners to intimidate, harass and even physically assault other inmates. A policy or custom is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." Peterson, 588 F.3d at 847-48 (citations omitted).

Here, plaintiff has not alleged, nor has he offered any evidence or argument to suggest, that Nueces County has an official written or otherwise specially articulated policy to not protect prisoners or to allow other prisoners to effectively "rule" the jail. Moreover, he does not suggest that the failure to protect inmates is so common, and well known to the policymakers, that it constitutes a custom that fairly represents official policy. Peterson, 588 F.3d at 848. To the contrary, based on plaintiff's own experience, if an inmate reports that he has been threatened, he is "racked up" and placed in protective custody. (DSJ Ex. B at 37). Here, as soon plaintiff advised Officer Hampton of the threatening note he found in his cell on March 27, 2009, he was moved and placed in protective custody. (DSJ Ex. B at 37. While in protective custody, officers made hourly reports on his condition. (See DSJ Ex. L,

"hour-out" logs for plaintiff from March 27, 2009, through June 22, 2009).  Plaintiff remained in protective custody until he was discharged from the jail.  Id.

At intake, it was noted that plaintiff had a past history with S.T.G.s and had worked as an informant such that he qualified for protective custody.  (DSJ Ex. M at 23, 26).  However, plaintiff did not identify any particular individual of whom he was afraid, and he did not request protective custody.  Thereafter, as soon as plaintiff advised jail officials about the note, he was moved to protective custody.  Thus, the uncontested evidence establishes that, once Nueces County was aware of a risk to plaintiff's health and safety, it took measures to alleviate the risk by placing plaintiff in protective custody, and plaintiff cannot establish that Nueces County had an unconstitutional policy or practice concerning his safety.  Thus, Nueces County is entitled to summary judgment in its favor on plaintiff's failure to protect claim.

### 2.    Conditions of confinement.

Plaintiff claims that, once he was placed in protective custody, his time out of his cell was limited to showers and one hour of recreation every two to three days, and that this excessive cell time amounted to unconstitutional conditions of confinement in violation of the Eighth Amendment.

Inmates have no protected liberty interest in specific recreational opportunities and the "[d]eprivation of exercise is not a *per se* constitutional violation."  Lewis v. Smith, 277 F.3d 1373, 2001 WL 1485821 at *1 (5th Cir. 2001) (unpublished) (citing Stewart v. Winter, 669 F.2d 328, 336 n. 19 (5th Cir. 1982).  "[W]hat is constitutionally required, however, is

that [the prisoner] not be confined for long periods without the opportunity for regular physical exercise."   The Fifth Circuit has noted that a deprivation of exercise may constitute an impairment of health, and such a claim must be examined on a case-by-case basis to consider, *inter alia*, (1) the size of the inmate's cell; (2) the amount of time the inmate spends locked in the cell each day; and (3) the overall duration of the inmate's confinement.  Hewitt v. Henderson, 271 Fed. Appx. 426, 428 (5th Cir. Mar. 26, 2008 (unpublished), citing Ruiz v. Estelle, 679 F.2d 1115, 1152 (5th Cir. 1982), *amended in part, vacated in part on other grounds,* 688 F.2d 266 (5th Cir. 1982).

 In determining whether a plaintiff has suffered an extreme deprivation, the length of confinement cannot be ignored.  Davis v. Scott, 157 F.3d 1003, 1006 (5th Cir. 1998).  Thus, to succeed on a claim for lack of exercise, plaintiff must provide facts that "support the existence of any health hazard under the specific circumstances involved."  Ruiz, 679 F.2d at 1152.

In this case, plaintiff's claim that he was denied time out of his cell for meals and recreation is not sufficiently serious to state an Eighth Amendment violation.  Indeed, the while plaintiff was in protective custody from March 27, 2009 through June 22, 2009, he was released 65 times as his turn came around.  (See DSJ Ex. L, hourly logs).  The hourly logs demonstrate that prisoners in protective custody were released cell by cell in turn, and that plaintiff was never denied his turn.  Id.  In fact, plaintiff has made no allegation that he was improperly singled out or otherwise not permitted time out of his cell while others were.  In addition, according to Peter B. Peralta, the Jail's Chief Deputy for Administration, plaintiff's

22

cell, unit 4R, measures 12'6" by 5'7", he was the only individual in the cell, and he was allowed to exercise in his cell.  (DSJ Ex. T, Peralta Aff't at ¶ 2).  Thus, considering the facts of plaintiff's particular case, he fails to establish that he was unconstitutionally denied appropriate recreation time.

Plaintiff also complains that he missed showers.  However, a short-term sanitation problem or restriction does not amount to the extreme deprivation necessary to make out a conditions of confinement claim.  Davis, 157 F.3d at 1005.  "[J]ails must provide only reasonably adequate hygiene and sanitation conditions."  Burton v. Cameron County, 884 F. Supp. 234, 241 (S.D. Tex. 1995) (citing Green v. Ferrell, 801 F.2d 765, 771 (5th Cir. 1986).  Plaintiff never filed an ICF or grievance complaining about a lack of showers.  (See DSJ Ex. B, Ex. O).   He does not allege any  harm resulting from the missed showers.  Moreover, plaintiff fails to establish that Nueces County had an unconstitutional policy or practice  concerning showers.  Peterson, 588 F.3d at 848.  Thus, the deprivation of showers of which plaintiff complains fails to state a constitution violation.

**C.    Negligence.**

Plaintiff has sued Nueces County for the injuries he claims he sustained when he exited the elevator on January 29, 2009.  Defendant denies that the elevator was not lined up with the floor, and points out that there are no contemporaneous documents to corroborate plaintiff's allegation.[4]  In addition, Nueces County claims that it is immune from suit under

---

[4] Defendant offers the records from the Nueces County Public Works Department relating to the repair and maintenance of the elevator used to transport inmates from Nueces County Jail to the various courtrooms in the courthouse.  (DSJ Ex. D at 3-18).  The records reflect that the elevator

the Texas Tort Claims Act (TTCA), Tex. Prac. & Rem. Code § 101.001 *et seq.*, arguing that

plaintiff failed to give proper notice of his negligence claim.

Under the TTCA, Nueces County is a government unit.  Tex. Civ. Prac. & Rem. Code

§ 101.001(3).  As such, Nueces County is immune from tort liability absent an express

legislative waiver of immunity.  Forgan v. Howard County, Texas, 494 F.3d 518 (5th Cir.

2007) ("A Texas Governmental unit is generally immune from tort liability unless the

legislature has somehow waived immunity.")  Governmental immunity protects political

subdivisions of the state such as counties from lawsuits for damages.  Harris County Hospital

District v. Tomball Regional Hospital, 283 S.W.3d 838, 842 (Tex. 2009).  Waiver of

immunity requires legislative action and "immunity is waived only by clear and unambiguous

language."  Id.; Tex. Dep't of Transp. v. Gutierrez, 284 S.W.3d 848, 850 (Tex. 2009).  A

statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected

by clear and ambiguous language.  Tex. Gov't Code § 311.034.

Under the TTCA, a governmental unit waives immunity for "personal injury and death

so caused by a condition or use of personal or real property if the governmental unit would,

were it a private person, be liable to the claimant according to Texas law."  Tex. Civ. Prac.

& Rem. Code § 101.021(2).  Under Texas law, "an elevator owner owes a duty of ordinary

care to protect invitees from an unreasonable risk of harm because of the elevator.  Dallas

Mkt. Ctr. Dev. Co. v. Liedeker, 958 S.W.2d 382, 384 (Tex. 1997).  Thus, plaintiff's claim

---

at issue was inspected on January 19, 2009.  Id. at 18.  There is no incident noted for January 29,
2009. Id. 5.

24

for damages against Nueces County for injuries allegedly sustained from a faulty elevator are not barred by governmental immunity and are expressly waived by the TTCA.

However, before a claimant may bring such a tort action against a governmental entity, he must give notice in accordance with the TTCA.  See Tex. Civ. Prac. & Rem. Code § 101.101(a).  At the June 4, 2009 Spears hearing, plaintiff stated that he was aware of the notice requirement.  The summary judgment evidence, however, demonstrates that plaintiff failed to give notice as required by the TTCA.  Nueces County Judge Samuel L. Neal, Jr., the authorized agent of Nueces County, testified that he did not receive any written notice from plaintiff regarding the claims raised herein or of this lawsuit as required by Tex. Loc. Gov't Code § 89.0041.[5]  (DSJ Ex. S, Neal Aff't at ¶ 2).  Moreover, the Commissioner's Court did not receive notice of plaintiff's state negligence claim *before* his lawsuit was filed.  Id.  Plaintiff did not present any claim concerning the injuries he allegedly sustained in a courthouse elevator to Nueces County.  Id.  In addition, Laura Garza Jimenez, the elected Nueces County Attorney, testified that she did not receive written notice of this lawsuit in the time and manner prescribed by Tex. Loc. Gov't Code § 89.0041, and, had plaintiff given pre-suit notice to Nueces County of his state court negligence claim in accordance with the Texas Tort Claims Act, she would have received a copy of the notice.  (See DSJ Ex. S,

---

[5] Tex. Loc. Gov't Code § 89.0041 provides in part, that a claimant must provide *post-suit* notice to the county judge and the county or district attorney.  However, this post-suit notice is not jurisdictional; it serves only to enable a county to respond timely to an action against it.  In contrast, the *pre-suit* notice required by the TTCA is jurisdictional; its purpose is to ensure that claims are promptly reported so the governmental entity may investigate the merits and possibly resolve them.  Turnbow v. Collingsworth County, 303 S.W.3d 353, 354-55 (Tex. App.–Amarillo 2009) (no writ).

Jimenez Aff't at ¶ 2).  By failing to give pre-suit notice as required by the TTCA to Nueces County, immunity is not waived and plaintiff's tort claim is barred.  Thus, Nueces County is entitled to summary judgment in its favor as to plaintiff's negligence claims.

## VI.    Conclusion.

For the reasons stated herein, Nueces County's motions for summary judgement (D.E. 59, 69) are granted, and plaintiff's claims against Nueces County are dismissed with prejudice.

ORDERED this 22nd day of June, 2010.

_____
     B. JANICE ELLINGTON
   UNITED STATES MAGISTRATE JUDGE